UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:23 CR 52 RWS (ACL) |
| BRETT MICHAELS CHILTON, | ) ) ) |
| Defendant. | ) ) |

**REPORT AND RECOMMENDATION**

This matter is before the Court[1] on Defendant Brett Michaels Chilton's Motions to Suppress Evidence (Doc. 52) and Statements (Doc. 51) secured by law enforcement following a traffic stop on February 28, 2023.

Chilton contends that the officer did not have a "legal basis to stop his car," and "exceeded the limits of a traffic stop when he began to search the vehicle without consent and when he ordered [Chilton] to exit" the van. (Doc. 52 at 5.) Next, Chilton claims that although he was given the *Miranda* warning, by that time "his will was already overborn such that the statements made throughout [his] encounter with law enforcement should all be suppressed…" (Doc. 51 at 1.)

The Government argues the traffic stop was reasonable under the Fourth Amendment and that Chilton's statements were voluntary. (Docs. 55, 72.)

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

Two people testified at the evidentiary hearing.  The Trooper who made the traffic stop and the backup officer who arrived on the scene.

The undersigned recommends that the Motions be denied based on the findings of fact and conclusions of law set out below.

### I.  Findings of Fact

After 9:00 p.m., on February 28, 2023, Missouri State Highway Patrol Master Sergeant (MSgt.) James Wilson was on routine patrol in Butler County Missouri.  MSgt. Wilson observed a minivan with a temporary registration tag approaching his vehicle from the rear at an excessive rate of speed.

MSgt. Wilson has had extensive training and experience with the patrol car's speed detecting radar system.  Prior to his shift, Wilson had conducted the prescribed checks on the system and determined that it was functioning properly.  Wilson activated the patrol car's speed detecting radar which indicated that the minivan was traveling 79 miles per hour although the speed limit was 65.  The undersigned finds MSgt. Wilson's testimony credible.  No evidence was presented to support Chilton's claim that he was not speeding.

MSgt. Wilson initiated a traffic stop on the minivan which promptly pulled over. Wilson approached the driver's side window and notified the driver, Brett Michaels Chilton, why he stopped the van.  He also asked why Chilton had not been wearing a seatbelt.  He requested that Chilton and the passenger provide identification and proof of insurance.  While doing so, Chilton asked for clarification about the stop.  MSgt. Wilson responded, "it's 'cause you were running 80, and then you come up behind me and then

realized that I was up there and you hit your brakes and started to duck in..." *See* Gov't. Ex. #1, dash cam video at 21:28:07. [2] Chilton did not dispute the officer's report.

MSgt. Wilson waited while the occupants searched for the information requested. He asked Chilton, who had face tattoos, if he was a convicted felon. Chilton replied affirmatively. When asked whether he made this inquiry routinely, MSgt. Wilson replied[3]:

> No, Mr. Chilton's appearance with his couple of tattoos right here[4] kind of made me wonder who I had stopped. Most folks don't have a tattoo. And sometimes that tattoo is indicative of someone who's committed crimes, maybe possibly been to prison. Maybe not. But, you know, it's a question. . .I certainly needed to -- I wanted to ask at that point to see who I had.

(Tr. 64.) MSgt. Wilson also asked whether there were any firearms in the minivan. Both Chilton and the passenger denied the presence of any guns.

After receiving the requested information, MSgt. Wilson asked Chilton to "come on back." *See* Gov't. Ex. #1, dash cam video at 21:30:10. As Chilton was exiting the van, the officer saw a gun on the seat. The officer said "Hey, whoa, whoa, whoa, whoa, whoa." *Id*. at 21:30:15. He gestured for Chilton to sit back down and commented about the item that had been "between [Chilton's] legs." *Id*. at 21:30:20. It was a 2-shot, Cobra .380 derringer pistol that was loaded with one live round and one spent casing. Chilton instantly raised his hands and kept them up.

---

[2] The undersigned examined the first file listed on the thumb drive which included "uba00292_20230301032610e0" in the file name.
[3] The Suppression Hearing Transcript, hereinafter "Tr. ___," was entered as Doc. 31.
[4] Although it was not stated on the record, MSgt. Wilson touched the side of his face while talking about Chilton's face tattoos, and the undersigned observed what appeared to be teardrops tattooed on Chilton's face.

Once the gun was secure, MSgt. Wilson instructed Chilton to step out and asked if Chilton had any other weapons.  Chilton replied that he did not.  Wilson also asked "what kind of felony" Chilton had.  *Id*. at 21:30:35.

During the hearing, the undersigned held the .380 derringer (identified as Gov't. Ex. #2).  It had some weight to it and measured roughly five inches long and more than two inches from the butt of the gun to the top of the barrel.  (Tr. 69-70.)  In consideration of the size, shape, and weight of the gun, it is hard to fathom that a person could sit on the gun with the gun being in the area between the upper portion of the thighs without noticing it.

Once the gun was secured, Chilton was instructed to exit the minivan.  MSgt. Wilson patted Chilton down before escorting him to the front passenger seat of the patrol car.  Chilton was not handcuffed nor was he told that he was under arrest.

During the evidentiary hearing, MSgt. Wilson explained why he generally asks people to accompany him to his patrol car following a traffic stop.

> Number one, my car offers a lot more safety than just this pair of pants does if I get hit on the side of the road.  Number two, it allows me to have conversation.  As you can see in the video that – the traffic sometimes you can't hear the passing traffic what the conversation is.
> And, also to get a better understanding of what's going on.  It allows me to also tell if a person has been drinking or using drugs.  I like to get them in a more controlled environment where we can speak, you know, and I can devote my attention more to them as far as watching cars behind me.

(Tr. 13-14.)

MSgt. Wilson acknowledged "There's been a trend to start making passenger side approaches.  I generally don't do them because in my part of the world down there the highway is a little more elevated, and the shoulder starts to drop off.  It really puts you at a disadvantage to stand on that side in my opinion."  (Tr. 42.)

As to why a driver would be taken out of the vehicle following a traffic stop, MSgt. Wilson explained:

> …I have them come back because I need to get their information.  I print a ticket back there with them.  A lot of times it gives me a chance to speak to them and learn about their journey.
> And sometimes there may be mitigating circumstances why they're in such a hurry and in that case I might issue a warning versus a speeding ticket.
> And over time I've learned that if you bring them back and give a person a change to talk to you a little bit, you can find out a lot of things, sometimes a justification for why they're in a hurry or what their issue is.
> And sometimes it's, you know I can determine if someone has been drinking, drug usage.  And I've heard. . the – majority of the troopers that have been killed have been hit by cars.  And I find it safer to bring them back and sit in my car and talk so I can go ahead and run those computer checks, so I can print the ticket if I decide to issue one.  All that in the safety of my car versus standing on the side of the road.

(Tr. 43-44.)  Wilson noted that in the first few years of his career, troopers typically wrote tickets while standing at the driver's window of stopped vehicles, in part because they didn't have computers in their patrol cars.  He further observed:

> I found that people – if you walk up and you keep it short and sweet, you know, I'm Trooper Wilson, the reason I stopped you is speeding, driver's license and insurance, I'll be right back, and you write a ticket, and you come back and give them that, they feel like they haven't had a chance to have their say.  And they – it kind of sometimes can leave a bad taste in their mouth.
> I like to bring people back also, like I said, to speak to them and listen to their version because everybody has their side of the story they want to tell, give them a chance to tell their side, the side whether I'm writing the ticket or not.
> And then we'll talk about it, explain things to them, and then send them

back to the car and send them on their way.

(Tr. 47-48.)

Before and after Chilton sat in the patrol car, he made numerous spontaneous statements denying his ownership, possession, or knowledge of the gun such as "I swear that's her gun," "She just bought the gun," and "It was so small I didn't even know, sir." MSgt. Wilson disagreed with Chilton's claims.  He also stated that Chilton's status as a felon prohibited him from possessing a firearm. When Chilton suggests a resolution of the matter, MSgt. Wilson responded, "Let's just stop with where we're at now, okay?" Chilton continued to claim, "Man, I had no idea, man, I know it seems like…"  *See* Gov't. Ex. #1, front seat video at 21:32:40.  MSgt. Wilson replied, "You can save that one because I'm not going to believe that …, because you're not going to tell me you don't know that gun's tucked between your legs, you can't get in and out of the vehicle without ... it's hot … that pistol's hot, it's been there a minute." *Id*. at 21:32.44 to 21:32:59.  Ten seconds later, MSgt. Wilson stated "before we keep peddling me a bunch of other lines, okay, you do have the right to remain silent…" *Id*. at 21:33:09. Wilson read the entire *Miranda* warning to Chilton from a card he carried in his shirt pocket. Chilton acknowledged understanding his rights.  As MSgt. Wilson conducted a record check and other business on his computer, Chilton continued to deny he possessed the gun, including statements like, "Officer, I didn't pick it up, I didn't touch it." *Id*. at 21:37:40.

While in the patrol car, a computer query revealed that Chilton was "on paper" and had an outstanding arrest warrant.  A backup officer arrived to maintain security at

the scene. *Id*. at 21:35:04. A few minutes later, Chilton was placed in handcuffs and arrested. *Id*. at 21:38:18.

Next, MSgt. Wilson returned to the minivan and asked Chilton's girlfriend how Chilton came to be in possession of the gun. She gave two mutually exclusive stories, neither of which were consistent with Chilton's statements that he didn't know the gun was concealed between his legs. Her first account was that she had become scarred when Wilson went to pull them over and handed the pistol to Chilton. Her second story was that they had a confrontation with a subject at Huck's convenience store earlier and that Chilton had removed the firearm from the console of the vehicle and had it at the time of the stop. MSgt. Wilson confronted Chilton with that story and although he admitted they had a confrontation with a subject at Huck's, Chilton continued to assert that he didn't know that he had the gun.

Chilton is charged with being a previously convicted felon in possession of a firearm. He requests suppression of the evidence seized from the minivan and all statements he made on February 28, 2023.

## II.  Discussion

Chilton claims that "Trooper Wilson inappropriately expanded the traffic stop without the legal authority to do so simply by requesting Chilton exit the vehicle after questioning him repeatedly about issues completely unrelated to the basis for the initial intrusion into Chilton's Fourth Amendment rights." (Doc. 70 at 9.) He complains that *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), does not "permit law enforcement to

question the driver of a car for three and a half minutes while he sits in the car, seeking to elicit incriminating information during a traffic stop, only to then force him into a police cruiser for additional discussion." *Id*. at 8.  Chilton avers that *Mimms* requires an officer's instruction for an occupant to exit their vehicle during a traffic stop to "be balanced with the level of intrusion to the occupant's Fourth Amendment rights."  (Doc. 70 at 6.)  He further complains that an occupant's appearance may impact how MSgt. Wilson conducts a traffic stop.  Chilton alleges that "a tattoo on a driver or occupant's neck or face will trigger" MSgt. Wilson to "ask[ ] more questions than he otherwise would, even when there is no other reason to believe anything nefarious is afoot." *Id*. at 9.

The Government disputes Chilton's arguments.  It counters that 1) "the traffic stop was based on reasonable suspicion" (Doc. 72 at 4); 2) "the roadside conversation was reasonable in scope and duration," *id*.; 3) "Chilton was lawfully requested to step out of the vehicle," *id*. at 7; 4) "the discovery of the pistol justified further investigation and detention," *id*. at 8; and 5) Chilton's statements prior to, and post-Miranda should be admissible," *id*. at 9.

**II.A.  Traffic Stop**

"The Fourth Amendment is not violated if the officer making an investigative stop has a reasonable suspicion of criminal activity." *United States v. Harris*, 617 F.3d 977, 978 (8th Cir. 2010) (citations omitted). The Eighth Circuit has repeatedly held that "even a minor traffic violation provides an officer with probable cause to stop the driver." *Id*. at

979 (citing *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008). *See also United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc); *United States v. Mallari*, 334 F.3d 765 (8th Cir. 2003). After an initial stop, the resulting detention must be no longer than reasonably necessary and must be reasonably related to the circumstances which initially justified the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

It has also been long established that a police officer incident to investigating a traffic stop, "has the authority to ask the driver what his or her destination and purpose is, check the driver's license and registration, or request that the driver step out of the vehicle," among other things. *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002). The Eighth Circuit instructs that "[a] traffic stop can last as long as reasonably necessary to conduct this routine investigation, conduct a criminal history search, and issue a citation. If this routine investigation raises the officer's suspicions and the officer has reasonable, articulable suspicion, the officer may expand the scope of the investigation." *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008) (internal citations omitted).

The Government further observed "it is well established that officers may make some inquiry that is off topic as long as it does not unreasonably prolong the stop." (Doc. 72 at 6.) As the Eighth Circuit found in *Rivera*,

> A trooper who has stopped a motorist based on probable cause "does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even if this conversation briefly extends the length of the detention.'' *Olivera–Mendez*, 484 F.3d at 510. As the Supreme Court recently reiterated, ''[a]n officer's inquiries into matters unrelated to the justification for the traffic stop…do not convert the en- counter into something other than a lawful seizure, so long as those in-

Page **9** of **16**

> quiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 129 S.Ct. 781, 788 (2009).

570 F.3d at 1013. Some of the off-topic inquiries the officer asked Rivera related to his occupation and whether he had guns or anything illegal in the truck. Just as the Eighth Circuit found "these brief inquiries did not measurably extend the seizure," MSgt. Wilson's questions of Chilton regarding whether he had any felony convictions or firearms in the minivan did not impermissibly prolong the seizure. MSgt. Wilson had several other tasks that needed to be completed, including a record check of the minivan's occupants.

The Supreme Court has commented that "traffic stops are especially fraught with danger to police officers … the risk of harm to both the police and the occupants of a stopped vehicle is minimized … if the officers routinely exercise unquestioned command of the situation." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (internal quotations and alterations omitted). Against this important safety interest, *Mimms* weighed "the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, … but by [an] order to get out of the car." 434 U.S. at 111. *Mimms* held that such an order "is at most a mere inconvenience" that "cannot prevail when balanced against legitimate concerns for the officer's safety." *Id*. The majority clarified they were not concluding that anytime an officer has occasion to speak with the driver of a vehicle, they may order the driver out of a car. "We hold only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out

of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id*. at fn 6.

"[A] traffic stop is constitutional, no matter the officer's subjective intent, so long as the officer had probable cause to believe that a traffic violation occurred." *United States v. Serena*, 368 F.3d 1037, 1041 (8th Cir. 2004) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). In *Serena*, the Eighth Circuit found the defendant's contention that he was "detained because of his Hispanic descent, his shaved head, and the tattoo across the back of his scalp" unpersuasive. *Id*. In this case, MSgt. Wilson had a reasonable and articulable suspicion that a traffic violation had been committed by an unknown person in a minivan. After the traffic stop, he noticed Chilton's face tattoo. In Wilson's experience, teardrop tattoos like Chilton had indicate that Chilton may have committed crimes or been to prison. In fact, Chilton was a convicted felon and he had been to prison. He was on parole at the time of the traffic stop. Chilton has not shown that MSgt. Wilson detained him solely on account of his felon status and his face tattoos.

What's more, as previously noted, an officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot. *Payne*, 534 F.3d at 951.

As argued by the Government:

In this instance, MSgt. Wilson had asked if Chilton had any weapons and ask[ed] about Chilton's criminal history. Chilton had been forthright about his felony convictions but blatantly lied about his being in possession of the pistol. MSgt. Wilson, or any other ordinary, reasonable and prudent person

> for that matter, concluded that criminal activity was afoot upon seeing the pistol and took additional steps to investigate that as well. That investigation did not unreasonably extend the stop, as it really consisted of a question as to whether Chilton had any other weapons, a brief pat down search, and a brief renewed discussion about Chilton's criminal history. The continued discussion in the patrol car where MSgt. Wilson and Chilton discuss the gun, as well as Chilton's attempt to explain away the circumstances was also reasonably related to the investigation of the gun and only lasted for a few minutes, again, not unreasonable under the circumstances.

(Doc. 72 at 9.)  The undersigned agrees.

Significantly, less than four minutes passed from the time MSgt. Wilson approached Chilton at the driver's side window and his observation of the firearm in plain view as Chilton was exiting the minivan.  That discovery converted a simple traffic stop for speeding into an investigation of a felon in possession of a firearm.

Based on the foregoing, the stop of the vehicle and seizure of the gun under the circumstances presented in this case was not in violation of Chilton's Fourth Amendment rights.

**II.B. Statements**

Chilton further argues that the purpose of the traffic stop was so that MSgt. Wilson could issue a speeding ticket.  (Doc. 70 at 11.)  He notes that Wilson asked "probing questions" that were "irrelevant to the purpose of the stop" and that he "took these actions predicated on the way Chilton looked" while "conceding Chilton was polite, not high, not drunk and was cooperative."  *Id*.  Chilton further complains that MSgt. Wilson "asked questions designed to elicit an incriminating statement, at some points telling Chilton the

Page **12** of **16**

story he was providing was not believable, goading Chilton to make a different statement." *Id*. Chilton argues that he was "hoodwinked into making statements through trickery, promises, assurances, threats, and inducements that rendered" the *Miranda* advisement ineffective. (Doc. 51 at 1.) Ultimately, Chilton claims that he was in custody throughout the interaction and all his statements, those made before and after receiving the *Miranda* warning, should be suppressed.

The Government responds that Chilton's assertion "that the addition of three questions; 'are there any weapons in the vehicle,' 'are you a felon,' and 'what kind of felony do you have' [ ] converted a lawful traffic stop into an unlawful detention and police interrogation" (Doc. 72 at 5) is not in accord with applicable law. It argues that the traffic stop amounted to an investigative detention, *Miranda* is not required when a person is detained pursuant to *Terry v. Ohio*, 392 U.S. 1, 30 (1968), and "Chilton was clearly not in custody for purposes of *Miranda* during the initial conversation about the gun in the patrol car." *Id*. at 10. Likewise, Chilton's statements regarding his possession of the firearm after the *Miranda* warning are also admissible in that "he indicated that he understood his rights and continued to make statements." *Id*. at 12.

The Government observed that "the question 'do you have any weapons in the vehicle' is also reasonably related to officer safety for obvious reasons." (Doc. 72 at 7.) The analysis in the prior section confirms that MSgt. Wilson's questions regarding Chilton's felon status and whether there was a gun in the vehicle were proper investigatory questions incident to a traffic stop. MSgt. Wilson did not ask what type of felony Chilton had been convicted of until after observing the pistol between Chilton's

legs.  Chilton does not dispute that the MSgt. Wilson read the *Miranda* warning to him after they were in the patrol car.

The Eighth Circuit advises that whether a particular statement from an officer "constitutes an interrogation depends upon the circumstances of each case," adding "we generally do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities." *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005).  Further, a statement of fact by an officer is not a plea to the conscience of the defendant, and therefore absent coercive pressure, is not likely to elicit incriminating information.  *United States v. Chipps*, 410 F.3d 445 (8th Cir. 2005).  Similarly, a voluntary statement "made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings." *United States v. Withorn*, 204 F.3d 790, 796 (8th Cir. 2000) (quoting *United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995)).  "An officer's request for clarification of a spontaneous statement generally does not constitute interrogation." *Chipps*, 410 F.3d at 445.

A stop is not custodial if it does not constrain the defendant ''to the degree associated with an arrest.'' *United States v. Pelayo-Ruelas*, 345 F.3d 589, 593 (8th Cir. 2003). Although stopped drivers are detained, they are generally not in custody during the roadside questioning that is permitted during a traffic stop, unless there is a formal arrest, or restraint on freedom of movement consistent with a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 423, 429, 439–42 (1984).  See also *J.D.B. v. North Carolina*, 546 U.S. 261, 270 (2011).

To the degree Chilton claims his statements were involuntary, the appropriate test for determining the voluntariness of a confession is "whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992) (quoting *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989)).  In analyzing the "overborne will" test, the court looks at the conduct of the officers and the capacity of the suspect to resist pressure to confess.  *Id*. (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)).

Based on the analysis above and review of the patrol car videos, Chilton was not in custody for purposes of *Miranda* until five minutes after the *Miranda* warning was given when Chilton was placed in handcuffs and formally arrested.

An examination of the totality of the circumstances in this case, confirms that Chilton's will was not overborn.  MSgt. Wilson's disagreement with Chilton's implausible explanations about the location of the gun continued for two minutes after the pair were seated in the patrol car.  Wilson then advised Chilton of the *Miranda* warning.  After the warning, Chilton continued to deny that he possessed the gun.  Throughout the interaction, Chilton responded appropriately to MSgt. Wilson's questions while attempting to convince MSgt. Wilson that he was unaware of the gun.  He also pleaded for an opportunity to speak with his girlfriend.  When confronted with his girlfriend's explanation about why the gun was between his legs, Chilton continued to deny that he possessed the gun.  Chilton was not mistreated, threatened, or coerced by MSgt. Wilson.

The Court finds that Chilton's responses to the roadside questioning, his spontaneous denial about possessing the gun, his disagreement with MSgt. Wilson as to

whether it was possible for him to be unaware of the pistol that was observed between his legs prior to receiving the *Miranda* warning, and his statements after receiving the *Miranda* warning should be admissible at trial.  His request for suppression of his statements should be denied.

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motions to Suppress Evidence (Doc. 52) and Statements (Doc. 51) be **denied**.

Further, the parties are advised that they have until October 23, 2024, to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 9th day of October, 2024.

s/*Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE